UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | CAUSE NO. 3:20-CR-24 DRL-MGG |
| MARCUS WILLIAMS, | |
| Defendant. | |

OPINION & ORDER

The government charged Marcus Williams with unlawfully possessing a firearm as a felon. He seeks to suppress evidence obtained by law enforcement the day he was arrested. He says both the traffic stop and its length violated the Fourth Amendment. Given the factual discrepancies here, the court held an evidentiary hearing on February 8, 2021 and thereafter received supplemental briefing. *See* Fed. R. Crim P. 12(d); *United States v. Coleman*, 149 F.3d 674, 677 (7th Cir. 1998); *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991). The court now denies the motion to suppress.

FACTUAL FINDINGS

On January 23, 2020 at 10:25 a.m., Indiana State Police Trooper Matthew Drudge was on patrol, as part of an interdiction team in South Bend, Indiana, when he saw a Buick swerve over the double yellow center line on Portage Avenue and then jerk back into the right lane (Tr. 6, 9-10, 25). He stopped the vehicle at 10:27 a.m. (Tr. 10).

Marcus Williams sat in the passenger seat while a woman drove (Tr. 12, 14-15). Trooper Drudge informed the driver that he stopped the car because she swerved out of her lane; she said she was unaware that she had swerved as she had been in the middle of a conversation with Mr. Williams (Tr. 13-14, 69-70). While she gathered her information, and Trooper Drudge asked her where they were traveling to and from, Mr. Williams engaged Trooper Drudge about whether the car had actually

swerved, telling him that he needed to mind his own business (Tr. 15-16, 72). Trooper Drudge asked Mr. Williams for identification, but he declined (Tr. 15-16).

Trooper Drudge returned to his police car to contact district radio, inform dispatch of the stop, and begin handwriting a warning for the violation (Tr. 16-17). That day Trooper Drudge's computer was broken, so he had to radio the driver's license and registration information over to dispatch and wait for it to be verified rather than run the information on his own (Tr. 17-18). He also had to handwrite the warning ticket (Tr. 18).

During the call to dispatch, Trooper Corinne Reinke arrived on scene, about two minutes after the stop (Tr. 17-18, 32). Trooper Drudge explained that Mr. Williams had been argumentative or deflective, and law enforcement knew the vehicle had recently left a convenience store where drug dealing was suspected, so Trooper Reinke called a canine unit (Tr. 19, 32, 48). South Bend Police Officer Greg Early and his K9 partner (Zoe) arrived at 10:33 a.m., approximately six minutes after the traffic stop (Tr. 20). Around the same time, Trooper Kyle Hudson arrived on scene (Tr. 37).

While Trooper Drudge awaited information from dispatch, the other officers prepared to conduct a canine search, including following their standard procedure to ask the two occupants out of the vehicle (Tr. 20). The driver exited, but Mr. Williams initially refused (*Id.*). Trooper Drudge exited his squad car to assist and asked Mr. Williams out of the car, and he promptly complied (*Id.*). The driver told Trooper Drudge a canine search wasn't necessary, and he held an incomplete warning in his hand during this exchange (Tr. 20, 71-72). The driver could not see what the warning said (Tr. 82).

At 10:37 a.m., about ten minutes after the traffic stop, Officer Early informed the troopers that Zoe had alerted on the vehicle (Tr. 21, 58, 60). In these ten minutes, Trooper Drudge still hadn't received verification that the driver had a valid driver's license and registration to enable him to complete the warning (Tr. 33-34, 39, 43-44).

2

Based on the canine alert, Trooper Drudge informed the driver and Mr. Williams of their *Miranda* rights (Tr. 21-22). Trooper Reinke and Trooper Hudson searched the vehicle (Tr. 22). The troopers found burnt marijuana cigarettes, marijuana remnants, and a handgun under the front passenger seat (Tr. 22-23, 79). Mr. Williams admitted he possessed the gun (Tr. 23). Trooper Drudge completed the warning after the vehicle's search (Tr. 44). The government charged Mr. Williams with unlawfully possessing a firearm as a felon.

These facts serve as the court's initial findings. Additional findings follow in the course of the court's discussion of the parties' legal arguments.

DISCUSSION

The Fourth Amendment to the United States Constitution establishes the people's right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." As the constitutional text suggests, the "touchstone of the Fourth Amendment is reasonableness." *United States v. Knights*, 534 U.S. 112, 118 (2001). The Fourth Amendment protects a person in his home and on the street, in his room and in his car. It protects people, not places. *Katz v. United States*, 389 U.S. 347, 351 (1967); *see also Terry v. Ohio*, 392 U.S. 1, 8-9 (1968).

A traffic stop by law enforcement, even when brief, constitutes a seizure of a person within the meaning of the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809-10 (1996). It must then be reasonable. *See id.* at 810. Evidence obtained from an unreasonable search or seizure must be suppressed. *Wong Sun v. United States*, 371 U.S. 471, 484 (1963).

The government bears the burden of proving by a preponderance of the evidence that a warrantless stop such as this one complied with the Fourth Amendment. *United States v. Peters*, 743 F.3d 1113, 1116 (7th Cir. 2014). The government has met its burden in this case.

A. *Law Enforcement Had Probable Cause to Stop the Vehicle.*

A law enforcement officer's decision to stop an automobile is reasonable when he has probable cause to believe that a traffic violation has occurred. *Whren*, 517 U.S. at 809-10. "Probable cause exists when 'the circumstances confronting a police officer support the reasonable belief that a driver has committed even a minor traffic offense.'" *United States v. Muriel*, 418 F.3d 720, 724 (7th Cir. 2005) (quoting *United States v. Cashman*, 216 F.3d 582, 586 (7th Cir. 2000)). It matters not whether a traffic offense actually occurred; the court only inquires whether the officer had probable cause to believe one occurred. *See id.*

Even minor traffic violations can provide law enforcement officers probable cause to stop a vehicle. *See United States v. Lewis*, 920 F.3d 483, 489 (7th Cir. 2019) (following a vehicle too closely); *Muriel*, 418 F.3d at 724 (same); *Cashman*, 216 F.3d at 586 (driving with cracked windshield); *United States v. Smith,* 668 F.3d 427, 431 (7th Cir. 2012) (failing to signal for a turn); *United States v. Smith*, 80 F.3d 215, 219 (7th Cir. 1996) (straddling lanes and failing to signal before a turn, and driving with cracked windshield); *United States v. Willis*, 61 F.3d 526, 530 (7th Cir. 1995) (speeding); *United States v. Cannon*, 2020 U.S. Dist. LEXIS 218957, 6-7 (N.D. Ind. Nov. 23, 2020) (failing to activate a turn signal at least 200 feet before turning); *United States v. Pina*, 2020 U.S. Dist. LEXIS 206115, 6-7 (N.D. Ind. Nov. 4, 2020) (failing to signal before changing lanes); *United States v. Sanders*, 2020 U.S. Dist. LEXIS 183073, 6-7 (N.D. Ind. Oct. 2, 2020) (failing to make a complete stop and illegal window tinting). Violating a lane-change rule likewise can provide probable cause for a stop. *See United States v. Bentley*, 795 F.3d 630, 633-34 (7th Cir. 2015).

Probable cause is "not a high bar." *Kaley v. United States*, 571 U.S. 320, 338 (2014). It "does not require an actual showing of criminal activity, or even that the existence of criminal activity is more likely true than not." *United States v. Howard*, 883 F.3d 703, 707 (7th Cir. 2018) (quotations omitted). By definition, probable cause looks to probabilities—"examining the totality of the circumstances in

4

a common sense manner," *United States v. Schaafsma*, 318 F.3d 718, 722 (7th Cir. 2003), and the "factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Gerstein v. Pugh*, 420 U.S. 103, 121 (1975) (quoting *Brinegar v. United States,* 338 U.S. 160, 175 (1949)). Probable cause is determined by reasonable conclusions drawn from the facts known to the officer at the time of the search or arrest. *Maryland* v. *Pringle*, 540 U.S. 366, 371 (2003). A law enforcement officer may act based on firsthand observations or the collective knowledge of law enforcement when officers communicate with each other. *United States. v. Williams*, 627 F.3d 247, 252-53 (7th Cir. 2010); *United States v. Ellis*, 499 F.3d 686, 690 (7th Cir. 2007).

Here, Trooper Drudge reasonably believed the Buick's driver committed a traffic violation by swerving across the double yellow line, which the officer described as lucky because no other traffic was oncoming. Under Indiana law, "[w]henever a roadway has been divided into two (2) or more clearly marked lanes for traffic, a vehicle shall be driven as nearly as practicable entirely between the lines marking the single lane and may not be moved from the lane until the person who drives the vehicle has first ascertained that the movement can be made with safety." Ind. Code § 9-21-8-11.5. Nothing on this record provided a legitimate reason for swerving into the other lane, other than the driver's distraction while in conversation with Mr. Williams.

The court credits Trooper Drudge's testimony for several reasons. In addition to his overall credibility, Trooper Drudge observed the vehicle cross the yellow lines while it was daylight and when there was no snow on the ground to obstruct his view (Tr. 7). There were no cars between Trooper Drudge and the Buick, and Trooper Drudge was only about one or two car lengths behind (Tr. 8). Trooper Drudge remembered specific details about how the driver swerved, including that both of the driver's tires crossed the center line and that the driver then "hurried up and whipped its wheel back into the lane to make the correction" (Tr. 9). He also recalled that there was no oncoming traffic at that particular moment (Tr. 10). He described it as a "dramatic violation," albeit for just a second

5

(Tr. 29). Last, he was closely watching the Buick because he had received a tip that there was drug dealing going on at a local convenience store that the vehicle had just left (Tr. 48).

Although the driver wasn't aware that she had crossed the center line (Tr. 72), she likely was distracted at the time from her conversation with Mr. Williams (Tr. 14). On the other hand, Trooper Drudge's focus was directly and closely on the vehicle ahead of him. Trooper Drudge saw what he reasonably believed to be a violation of the law, and he stopped the Buick accordingly. He had probable cause to do so.

### B. *The Traffic Stop and Canine Search Were Timely, and the Consequent Search of the Vehicle Was Lawful.*

Mr. Williams argues that the canine search was unlawful because law enforcement detained the car longer than necessary to issue a warning. A stop that started lawfully can violate the Fourth Amendment if its manner of execution unreasonably infringes on constitutionally-protected interests. *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). For example, "[q]uestioning that prolongs the detention, yet cannot be justified by the purpose of such an investigatory stop, is unreasonable under the [F]ourth [A]mendment." *United States v. Childs*, 277 F.3d 947, 952 (7th Cir. 2002) (*en banc*). A seizure that is justified "solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Caballes*, 543 U.S. at 407.

The permissible duration of a traffic stop is "determined by the seizure's 'mission'—to address the traffic violation that warranted the stop and attend to related safety concerns." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (citations omitted). "Unrelated inquiries may not measurably prolong a traffic stop, although an officer may conduct ordinary inquiries incident to the stop such as questions involving the driver's license, the vehicle's registration, and whether there are outstanding warrants for the driver." *United States v. Stewart*, 902 F.3d 664, 672 (7th Cir. 2018). Even then, an "officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the

6

duration of the stop." *Arizona v. Johnson*, 555 U.S. 323, 333 (2009) (citation omitted); *accord Muriel*, 418 F.3d at 726 (officer may ask a "moderate number of questions," even "questions that do not concern the purpose of the stop and that are not supported by any other suspicion").

The key question here is whether the arrival of Officer Early and the completion of a canine search within ten minutes of the traffic stop unreasonably prolonged the stop beyond what it would have taken for Trooper Drudge to complete his mission of issuing a warning to the driver. *See United States v. Lopez*, 907 F.3d 472, 486 (7th Cir. 2018) ("The question does not depend on exactly how many minutes the stop lasts. It depends on whether law enforcement has detained the person longer than needed to carry out the investigation that was justified by the reasonable suspicion."); *see, e.g., United States v. Offord*, 788 Fed. Appx. 384, 387 (7th Cir. 2019) (time from the initial stop to the dog alert was not unreasonably prolonged when the trooper was processing the passenger's outstanding arrest warrant and briefing another officer who arrived on the scene); *United States v. Sanford*, 806 F.3d 954, 956-57 (7th Cir. 2015) (total time of 26-27 minutes from the initial stop of the vehicle to the dog alert was reasonable when the trooper was checking the occupants' criminal histories on the computer in his car and obtaining additional suspicious information from the driver).

The stop's duration and the resulting search and seizure were constitutionally reasonable. For one, the trooper had to go "old school" here. Without a computer, he had to call dispatch and relay the information about the driver, her license, and her registration for verification. He then had to handwrite the warning—something he had begun but could not complete because, by the time the canine alerted, dispatch had not yet confirmed the driver's information. There is nothing unusual or unreasonable about the approximate ten minutes that passed—particularly so when Trooper Drudge still needed to hear from dispatch to complete his mission. *See, e.g., Sanford*, 806 F.3d at 957. By definition, nothing that happened in the interim period delayed this stop at all, much less measurably so. *See Rodriguez*, 575 U.S. at 354. That is sufficient basis alone to deny this motion.

To be sure, witnesses offered inconsistent testimony about how much time passed, when Trooper Drudge completed his mission of preparing the warning, and when the canine search occurred. For instance, the driver testified that the canine unit arrived about 20 to 30 minutes after the traffic stop (Tr. 86). The driver said she didn't know exactly why she thought it was between 20 and 30 minutes and that it "just felt like it was a really long time" (Tr. 82-83). She said it was her best guess (Tr. 83). The amount of time probably felt longer to her because she was anxious after just having been pulled over. In fact, after she was asked to step out of the vehicle but before she was handcuffed, she mentioned that she was "freaking out" (Tr. 76). She could not see the warning she thought was in Trooper Drudge's hand or whether it was completed (Tr. 82), and indeed it was not delivered to her, as completed, until she was at the jail (Tr. 43). For a number of reasons then, her testimony is imprecise and not credible.

In fairness, Trooper Drudge stumbled on occasion in his testimony, but overall the court finds his testimony credible, particularly as corroborated. Trooper Drudge precisely stated that the canine unit arrived six minutes after the stop when he was still awaiting dispatch's return (Tr. 20). That timeline coincides with Officer Early's testimony that he arrived "fairly quick" because he was "close" (Tr. 56). Trooper Drudge later testified on crossexamination that the canine unit arrived ten minutes after the traffic stop (rather than six minutes) (Tr. 33-34), but that was a momentary lapse that he thereafter corrected to state once more that the canine's alert, not its arrival on scene, occurred ten minutes after the stop (Tr. 42-43). To the point of the constitutional question here, however, *see Lopez*, 907 F.3d at 486, Trooper Drudge's mission of completing the warning based on information from the driver and dispatch had not concluded by the time of the canine alert (Tr. 43-44). Indeed, it would take him normally about 6-8 minutes to handwrite a warning once he had the information (Tr. 40), though the court believes it would be less here because he had already started the process (Tr. 46).

At no time was Trooper Drudge's mission measurably delayed. Mr. Williams says the stop was unreasonably prolonged because Trooper Drudge asked them questions like where they had been and where they were going, but law enforcement may ask a "moderate number of questions," even if these questions don't "concern the purpose of the stop and that are not supported by any other suspicion." *Muriel*, 418 F.3d at 726. These were routine and reasonable questions to ask.

Trooper Drudge otherwise set about his task. He reasonably returned to his squad car about two minutes later (because Trooper Reinke shortly arrived). He had to read to dispatch all the information from the driver's license phonetically, and he also had to read the registration over the radio (Tr. 46). That no doubt took longer than normal, though on this record not demonstrably so; and, in any event, it was all necessary for this stop. Officer Early arrived about six minutes after the stop, while Trooper Drudge was still awaiting dispatch's verification. Officer Early parked near the stop (Tr. 59). His dog worked promptly and accurately in about four minutes.[1] Though Trooper Drudge exited his squad car to assist his colleagues to extricate Mr. Williams from the vehicle, that took little time because Mr. Williams got out immediately; and again, Trooper Drudge was still awaiting dispatch. In any event, he could so act for safety reasons. *See Arizona*, 555 U.S. at 331; *Maryland v. Wilson*, 519 U.S. 408, 415 (1997). Indeed, he testified he did so for safety reasons (Tr. 41).

The court sees nothing on this record that suggests an unreasonably prolonged delay. Trooper Drudge needed dispatch's verification before he could complete his mission of issuing a warning to the driver. Verification didn't come until after the canine alerted, at which point law enforcement had probable cause to search the vehicle. Even if dispatch's verification had come slightly sooner, this stop was not just reasonable, but prompt.

---

[1] According to Officer Early, this canine has been one hundred percent accurate on her testing to maintain her annual certifications for several years (Tr. 54). "Her alerts are solid. She sits, stares until she gets a reward with her tennis ball. There's no guessing. Any lay person could see" (Tr. 58). No truer is it because even the driver observed this alert (Tr. 75-76).

CONCLUSION

The Fourth Amendment prohibits unreasonable searches and seizures, not good police work justified by prompt investigation and probable cause. Law enforcement in this case had probable cause and otherwise acted reasonably in the search and seizure on January 23, 2020. Accordingly, the court DENIES Mr. Williams' motion to suppress (ECF 26).

SO ORDERED.

February 19, 2021    *s/ Damon R. Leichty*
                     Judge, United States District Court